## THE EGYPT.[1]

### ACKER and others *v.* THE EGYPT.

### HOUSTON *v.* SAME.

### PERSON and others *v.* SAME.

*(District Court, S. D. New York.  October 6, 1885.*

1. FIRE ON WHARF—BURNING OF CARGO LANDED, BUT NOT DELIVERED—STATEMENT.

  The steamship E., of the National Line, arrived in the port of New York about 1 o'clock P. M. of January 31, 1883. She at once obtained from the collector of the port a general order for discharge on the dock, a further special permit for continuing the discharge after sunset, and a permit for goods not entered to remain on the dock 48 hours after discharge. These permits were obtained under section 2871, Rev. St., and regulations prescribed by the secretary of the treasury. This was the customary method pursued by the steamship company. The discharge of cargo was immediately commenced and continued until about 2 o'clock A. M. of the following night, when fire broke out on the wharf from some unknown cause, and, so far as appeared on the trial, without the fault or negligence of any one, and libelants' goods, which had been landed on the wharf, were consumed.

2. SAME—FIRE COMMUNICATING WITH STEAM-SHIP—SECTION 4282, REV. ST.

  Where goods on a wharf are destroyed by a fire that originates on the wharf and is communicated to the vessel along-side, from which they were discharged, the ship will not be relieved from liability under section 4282, Rev. St., as for a "loss by reason of a fire happening to the ship," if it does not appear that the firing of the ship contributed to the burning of the goods on the wharf.

3. BILL OF LADING — "GENERAL ORDER" FOR DISCHARGE — NOTICE TO CONSIGNEE.

  The bills of lading under which the goods burned were shipped, were partly of the National Line and partly of the Inman Line. Both bills of lading contained the stipulation that "the collector of the port is hereby authorized to grant a general order for discharge immediately after entry of the ship;" also that "the goods are to be taken from along-side immediately the vessel is ready to discharge, or otherwise they will be landed and deposited at the expense of consignee, and at his risk of fire," etc. Under the "general order" the cargo had been partly discharged when the fire occurred. Libelants urged that without notice of the discharge, or opportunity to remove their goods, the discharge was not a valid discharge, and that the stipulations of the bill of lading did not come into effect until after such notice. *Held,* that the meaning of the bill of lading was that the parties agree that the ship shall be authorized to procure permission from the collector to land the goods *instanter*, without notice to the consignees, and that if consignees are not there to receive them, the ship may nevertheless land the goods at once, and that they shall then be at consignee's risk.

[1] Reported by R. D. and Edward G. Benedict, Esqs., of the New York bar.

4. Ship's Agreement with Collector to Pay for Goods Burned — No One but Collector can Take Advantage of It — Admiralty Jurisdiction — Sections 2872, 2959, 2960, Rev. St.

To procure a permit from the collector for the goods to be left on the wharf 48 hours after the granting of the general order to unload, the agents of the steam-ship signed an application, the form of which is prepared and exacted by the collector, by which request was made to allow the cargo to remain on the wharf 48 hours " at the sole risk of the owners of said steamer, who will pay to the consignee or owner the value of such cargo respectively as may be stolen, *burned*, or otherwise lost." Under this clause libelants claimed to recover. Claimants objected that this agreement was not within the jurisdiction of the admiralty, and, moreover, that no one but the collector could take advantage of it. Section 2872, Rev. St., declares that " any liability of the ship-owner to consignees shall *not be affected* by the granting of such special license, (to land at night,) or of any *general order*," etc. *Held*, that the agreement in question, if available to the consignees, would be a maritime contract of which the admiralty would have jurisdiction; that the agreement, however, would be valid only for the collector's benefit, to indemnify him for loss, if any, through want of the due and reasonable care required by sections 2959 and 2960. Beyond that, the statute would seem to make it invalid, as exacted without authority.

5. Bill of Lading — Rights of Parties Fixed by its Terms — Exceptions against Fire.

The bills of lading of both steam-ship companies contained exceptions against loss by *fire;* the National Steam-ship Company's bill of lading excepting " fire before loading in the ship or after unloading;" the Inman bill excepting " fire at any time and place." *Held*, that these and the above-recited stipulations of the bills of lading had been framed in view of the usage and custom of discharging that had long prevailed at this port, and in anticipation of the agreement subsequently made with the collector in the usual form; that the stipulations were reasonable and valid, and had fixed the rights of the consignees, which were not varied by subsequent agreement with the collector; that this agreement with the collector was not to be construed as designed for the benefit of the consignees, and was not available to them; and the steam-ship, therefore, was exempted from liability for this loss, and the libels should be dismissed.

6. Same — Exemption from Loss Capable of being Covered by Insurance — Evidence Necessary.

The bill of lading contained a further exemption from any loss " capable of being covered by insurance." *Held*, a reasonable and valid exception, but not to excuse loss by carrier's negligence. Proof that insurance is procurable is necessary to make the exemption available.

7. Discharge by Night not Negligence — Usage.

A discharge by night under a permit from the collector, in accordance with long-established usage, is as lawful and valid as a discharge by day, and is not, *ipso facto*, negligence, any more than a discharge by day.

In Admiralty.

The above three actions were brought to recover $11,250, the value of merchandise imported from Europe, consigned to the libelants, and destroyed by fire at the Inman Company's pier, North river, on the night of January 31, 1883. Numerous other actions are pending in this court growing out of the same fire. The steamer arrived about 1 p. m. of January 31st. She obtained at once, from the collector of the port, a general order for her discharge upon the dock, a further special permit for continuing the discharge after sunset, and a permit for goods not entered to remain on the dock for 48 hours after discharge. These permits were obtained under section 2871, Rev. St., and under regulations prescribed by the secretary of the treasury,

v.25F,no.6—21

dated May 5, 1877. These regulations provided that goods landed, for which no permit for delivery to their owners had been obtained, should be sent by the collector to the general order store, but that the collector might, at the request of the master, etc., allow goods landed, but not "permitted" to remain on the docks, "at the sole risk of the owner of the vessel, not longer than 48 hours from the time of the discharge, upon the production of evidence that the owner of the vessel assumes the risk of the goods allowed to remain, and agrees to pay the duties on any goods that may be lost by so remaining;" also that, in order "to continue the discharge of the cargo after sunset, a special license must be obtained in accordance with section 2871, Rev. St." That section provides that, to obtain such a special license, the collector must be indemnified against any loss, and also that "the liability of the master or owner of any such steam-ship to the owner or consignee of any merchandise landed from her, shall not be affected by the granting of such special license or of any general order; but such liability shall continue until the merchandise is properly removed from the dock whereon the same may be landed." Section 2969, Rev. St., provides that "all merchandise of which the collector shall take possession under the provisions relating to the time for the discharge of a vessel's cargo, shall be kept with due and reasonable care at the charge and risk of the owner."

To obtain the benefit of the above permits, the agents of the steamer signed the following applications, the forms of which were prepared and exacted by the collector:

"Request is made to allow the cargo of the steamer Egypt, Sumner, from Liverpool, England, unladen, but not permitted, to remain upon the wharf for forty-eight hours from the time of granting general order, at the sole risk of the owners of said steamer, *who will pay to the consignee or owner the value of such cargo*, respectively, as may be stolen, *burned*, or otherwise lost; and who will also pay all duties on cargo which may be in any way lost by so remaining."

"Application is hereby made for a special license to unlade upon the wharf, after sunset, the cargo of the S. S. Egypt, —————— master, which arrived at this port on the thirty-first day of January, 1883, from Liverpool, England. This application is made in consequence of want of time, and the undersigned have given a bond to the collector of the port in conformity with sections 2871 and 2872 of the Revised Statutes, in the sum of twenty thousand dollars, and have deposited ten dollars per night for each inspector whose services may be required under the license, namely, for two inspectors for one night, being the night of January 31st."

A bond was given to the collector in the sum of $20,000, conditioned to "indemnify and save harmless the said collector from any and all losses and liabilities which may occur or be occasioned by reason of the granting of such special license."

Under the three permits thus obtained, the immediate discharge of the steamer's cargo was commenced at 1: 30 P. M. of January 31st, and continued during the night. At about 2 o'clock A. M. a fire broke out upon the dock from some unknown cause, and, so far as appears,

without the fault or negligence of any one, and the libelant's goods were consumed.

*Acker & Ferris* and *Stephen A. Walker*, for libelants Acker and others.

*Coles Morris* and *Billings & Cardozo*, for libelant Houston.

*Kobbe Bros.*, for libelants Person and others.

*John Chetwood* and *Robert D. Benedict*, for the Egypt.

BROWN, J. Considering that business at the custom-house closes at 3 P. M., I must find upon the evidence that there was not reasonable time, after the arrival of the ship, for the consignees, by the use of ordinary diligence, to enter the goods at the custom-house and get a permit on January 31st, so as to remove the goods from the dock before the fire. So far as appears, therefore, the loss arose without negligence on either side. No notice of intended discharge was given by the ship to the consignees.

1. Section 4282 of the Revised Statutes provides that "no owner of any ship or vessel shall be liable * * * for any loss or damage which may happen to any goods which shall be shipped, taken in, or put on board any such ship, by reason or by means of any fire happening to or on board said ship, unless said fire is caused by the design or neglect of such owner." The fire in this case originated upon the dock; it extended to the steamer so far as to do some damage to her hull and rigging before she was towed away. No injury happened to any goods that remained on board. It is urged that this was but a single fire; and as it extended to and injured the ship, and in fact prevented her from completing the delivery of the goods to the consignees, about which the ship was engaged at the time of the fire, it was a fire that literally and substantially "*happened to the ship.*" I do not think that the phraseology of the statute, though capable of this broad construction, was intended to cover a fire originating on the dock, and happening to goods after they had been landed. I do not think the statute intended to cover such a case as this. The loss of the goods must be "by reason or by means of" the fire that happens "to the ship," or "on board" of her. By that is meant a fire that happens to the ship physically; not one that happens merely to interrupt the performance of her duties in respect to the goods upon the dock. If the statute included the latter, it would apply, although the ship herself were not touched by the fire at all. This is not, I think, the sense of the statute. So also, in a certain sense, the fire is one fire; but not in the meaning of the statute. If the statute would not apply in case the fire did not reach the ship at all, through her being towed away before it extended to her, it would be a very unreasonable construction to hold that the statute would apply merely because she was not taken away in time to escape the fire; the loss of goods on the dock being alike in both cases, and not occurring by reason of any fire happening to or aboard the ship literally. What is meant is that the fire that "happens to or on board the ship" must

be the *cause* of the loss. That was not so in this case. The statute, moreover, was designed to give relief against the consequences of fires incident to navigation. After goods have been landed, wholly different and additional causes of fire arise, not at all dependent on navigation. The statute does not, in my judgment, cover all these additional liabilities to fire, nor embrace goods landed that are injured through a fire not originating on the ship, nor communicated to the goods from the ship.

2. As no delivery of the goods had been made to the consignees, nor reasonable opportunity afforded to the owners to receive and take them from the dock before the fire, the ship and her owners must be held liable as common carriers for the loss of the goods burned, unless they are exempted by the terms of the bills of lading. The steamer belonged to the National Steam-ship Company. In the case of Acker, the goods came under the bills of lading issued by that line. In the other two cases, the goods came under bills of lading of the Inman Line, which had forwarded the goods by the Egypt. The National Steam-ship Company's bills of lading contain, among numerous other stipulations, the following exceptions:

"Fire *before* loading in the ship or *after unloading,* \* \* \* and all loss, damage, or injury arising from the perils or matters above mentioned, and whether such perils or matters arise from the negligence, default, or error in judgment of the pilot, master, mariners, engineers, stevedores, or other persons in the service of the ship-owner. \* \* \* The goods to be taken from along-side by the consignee immediately the vessel is ready to discharge, or otherwise they will be landed by the master, and deposited at the expense of consignee, and at his risk of fire, loss, or injury in the warehouse provided for that purpose, or in the public store, as the collector of the port of New York shall direct, and when deposited in the warehouse or store, to be subject to storage; the collector of the port being hereby authorized to grant a general order for the discharge immediately after entry of the ship. The United States treasury having given permission for goods to remain forty-eight hours on wharf in New York, any goods so left by consignee *will be at his or their risk of fire, loss, or injury.*"

The exceptions of the Inman Company's bills of lading included the following:

"Risk of lighterage to and from the vessel, of craft or hulk or transhipment, jettison, explosion, heat, *fire at any time and in any place,* boilers, steam, or machinery, or the consequence of any damage to boilers or machinery, or defect therein, collision, stranding, straining, or other perils of the seas, rivers, navigation, or land transit, of whatsoever nature or kind, and whether any of the things and perils above mentioned, or the loss or damage arising therefrom, be caused by the wrongful act, default, negligence, or error in judgment of the pilot, master, officers, crew, stevedores, or other persons in the service of the ship, or for whose acts the ship-owner would otherwise be liable. \* \* \* The goods to be taken from along-side by the consignee immediately the vessel is ready to discharge, or otherwise they will be landed by the master and deposited at the expense of the consignee, and at his risk of fire, loss, or injury, on the dock or wharf, or in the warehouse provided for that purpose, or sent to the public store, as the collector for the district shall direct; and when deposited in the warehouse no

expense of storage to be charged to the government, and the keys of the warehouse to be delivered to and kept in charge of the officer of customs, under the direction of the collector; the collector of the port being *hereby authorized to grant a general order for discharge immediately after entry of the ship*. The ship-owner is not to be liable for any loss, detriment, or damage to any goods which is capable of being covered by insurance, and shall only be called upon to pay for any loss, detriment or damage, so far as it may be uncovered by insurance. * * * It is expressly stipulated that the goods and merchandise mentioned in this bill of lading, while awaiting shipment on any quay or lighter in Liverpool, and also as soon as they are *discharged over the ship's side, shall be at the risk of the shipper or consignee.*"

There can be no question that the first and last clauses of the National Steam-ship Company's exceptions, above quoted, embrace a loss by fire such as this. No language could be employed more explicit or more apt to meet the precise contingency that has happened. If the use of the words "left by the consignee," in the last clause, might possibly be construed as meaning only a *voluntary* leaving after notice, and a sufficient time for removal, the first clause cannot be thus limited. I cannot regard either clause, however, construed according to the apparent fair meaning and intent of the whole bill of lading, as dependent for its legal operation upon any prior notice to the consignee, either of the ship's arrival or of her readiness to discharge; for one of the clauses of the same bill of lading authorizes the collector to grant a general order for the discharge immediately after the entry of the ship, and if the consignee is not then ready to take the goods from along-side they are to be landed by the master. These clauses, all together, indicate an unmistakable intention that the steamer might begin her discharge upon the dock as soon as her general order and permit could be obtained, and that the consignee should abide the risk of fire from the time the goods were unladen. The case, in this respect, does not differ in principle from the case of *Scott* v. *Baltimore, C. & R. Steam-boat Co.*, 19 Fed. Rep. 56, where the goods were delivered into the defendant's possession and upon its wharf to be transported, and the bill of lading excepted "loss by weather, fire," etc., and it was held that a loss by fire on the wharf before lading on board the steamer was within the exceptions, and that the defendants were not liable. The court say:

"It is difficult, therefore, to see why, if he stipulates generally for exemption from losses from fire, he should not be understood to mean exemption while the goods are in his possession preparatory to their being laden, as well as afterwards. In most instances there must be some interval of time between the reception of the goods and their being actually laden on board the vehicle of transportation, and as the law sanctions contracts by which the carrier exempts himself from the risks of fire, it seems to me it would be a very strained and forced construction of these contracts now before me to hold that the exemptions in them from fire, leakage, and breakage do not apply to losses from those risks while on the wharf, because they are mentioned in the same sentences with other risks which are only encountered on the voyage itself."

The Inman Company's bills of lading do not contain any clause in the precise words above referred to, but they contain several clauses

and exceptions of equivalent legal effect: (1) "Fire at any time and in any place." (2) If not taken by the consignee "immediately the vessel is ready to discharge," the goods will " be landed by the master, and *deposited* at the expense of the consignee, and *at his risk of fire*, loss, or injury, *on the dock* or wharf, or in the warehouse provided for that purpose, or sent to the public store, as the collector shall direct," etc. (3) "The ship-owner is not to be liable for any loss that is capable of being covered by insurance," etc. (4) "The goods, while awaiting shipment, and also as soon as they are discharged over the ship's side, shall be at the risk of the shipper or consignee."

It is urged that the first clause is to be construed *a sociis*, and therefore limited to fire while on board of the steamer, or of any other vessel to which the goods might be transferred. But I do not find that the context fairly indicates any such restriction, nor do I think that in a document of this kind a general clause so broad and so explicit as this should be held inapplicable merely because other clauses may also cover the same contingency. See *Providence & N. Y. S. S. Co.* v. *Hill*, 109 U. S. 594; S. C. 3 Sup. Ct. Rep. 379. If there were anything incompatible between the general and the more particular clauses, the former must give way. Here there is nothing incompatible. The observations of Judge MORRIS in the case of *Scott* v. *Baltimore, etc.*, just quoted, are pertinent here.

The second clause, it is claimed, does not take effect until the goods are *deposited* in a warehouse on the dock, or until after notice to the consignee and opportunity to remove the goods. The use of the phrase "deposited at his *expense*," it is urged, supports this construction. That seems to me an unwarrantable restriction of the fair and natural import of the language used. The words are, "landed by the master, and deposited at the expense of the consignee, and at his risk of fire, loss, or injury, on the dock or wharf, or in the warehouse provided," etc.; *i. e.*, either on the dock or in the warehouse. Goods may be "deposited" on the dock, as well as in a warehouse. The meaning is that if any expense attends either, the consignee is to pay it. The language is clearly meant to cover the different alternatives referred to, according as the occasion shall require.

The last clause is substantially to the same effect, viz., that the "goods shall be at the consignee's risk as soon as they are discharged over the ship's side." This clause alone would, doubtless, not authorize the ship to discharge without notice at any improper time or place, having reference to the safety of the cargo, or to its preservation from obvious danger of injury or destruction. A discharge involving such risks, if made without notice to the consignee, is not a lawful discharge, but clearly a wrongful and negligent discharge, and not within any reasonable construction of the stipulations. *The Aline*, 19 Fed. Rep. 875; *The Boskenna Bay*, 22 Fed. Rep. 662. But the second clause is more specific than the fourth, and seems intended to authorize the ship to land the goods at the consignee's risk if the

goods are "not taken by the consignee immediately the vessel is ready to discharge."

It is strenuously urged that without previous *notice* to the consignee, and opportunity to remove his goods, the discharge is not a lawful or valid discharge as between the parties, and that the stipulation of the bill of lading does not come into effect until after such notice. The second clause evidently contemplates the probability that the goods *may not* be immediately taken when the ship is ready to discharge, and the context supplies the reason, viz.; because the collector is "authorized to grant a general order for discharge immediately after entry of the ship;" *i. e.*, before such notice can be given to the consignee. Construing these clauses together, it seems to me clear that the meaning and intention of the bill of lading are that the parties agree that the ship shall be authorized to procure permission by general order from the collector to land all the goods *instanter*, without notice to the consignee; and that if the consignee is not there, "ready to take them," as in all probability he will not be, the ship may nevertheless land the goods at once, and they shall then be at the consignee's risk. This is the practical construction that has long been given to stipulations of this character. The general order itself for the discharge of the goods under section 2966 is based on this construction, and it is adapted to the ship's need of prompt discharge. The business of steamers has been long adjusted to this interpretation; and as it accords clearly with the natural meaning of the language, it must be taken as the legal construction. Such stipulations and exceptions must be upheld so far as they are reasonable, and do not oppose any rule of law. If they are often so numerous as to cover most of the risks of the voyage, consignees have compensation for the risks they assume in the minimum rates of freight. In the sharp competition of business, freights have become almost incredibly low, and have compelled steam-ship lines to seek to exempt themselves from risks so far as possible. By applying the saving in freight to insurance, consignees may have the responsibility of insurance companies as a substitute for the former full responsibility of the carrier.

The exceptions above cited cannot excuse negligence in the ship as to the particular time or mode of discharge; nor, as above observed, can they justify the exposure of goods to manifest danger of destruction or injury under peculiar circumstances, such as tempests or frosts, that might destroy them; because the very objects of commerce forbid the supposition that any such exposure could be within the possible intention of such a general stipulation; and a construction which would admit that result would be, therefore, clearly unreasonable and must be rejected. *U. S.* v. *Kirby*, 7 Wall. 486; *Raymond* v. *Tyson*, 17 How. 59–62. But I see nothing unreasonable in a stipulation that permits landing upon the dock without notice, under the ordinary conditions of day or night, and when the goods are exposed to none

but the ordinary risks, and are still cared for with ordinary diligence until the consignee, on notice, can take them away. But as such a discharge, without previous notice, does not constitute a delivery to the consignee, the ship, as carrier, is still bound to the use of ordinary and reasonable care for their safety. The general language of a stipulation like this is not construed as exempting the ship from that duty, any more than it can excuse any other acts of negligence; and if this bill of lading should explicitly exempt the ship from the use of reasonable care of the goods, in the absence of previous notice to the consignee, that stipulation would be held invalid in the United States courts, on the same grounds that other stipulations against responsibility for negligence are held invalid. *Railroad Co.* v. *Lockwood,* 17 Wall. 357; *Express Co.* v. *Caldwell,* 21 Wall. 264.

In the case of *Gleadell* v. *Thomson,* 56 N. Y. 194, 197, 198, the court say, in reference to the need of prior notice of landing, under a stipulation similar to the present:

" The privilege to make this disposition of them was secured to him by the bill of lading. * * * It was not incumbent upon the plaintiff to give notice of a readiness to discharge the goods as a condition of his exercising the privilege of depositing them upon the piér. They, however, remained after such deposit in his custody as carrier, subject to the modified responsibility, created by the contract, until after such notice had been given to the consignee of their arrival, and a reasonable time had elapsed for their removal. Meanwhile, the defendants assumed the risk of ' fire, loss, or injury ' to the goods, according to the contract; but the language used did not exempt the plaintiff from liability for an injury resulting from his own negligence."

This seems to me to be a perfectly just and sound exposition of the law, and to be precisely applicable to this case. Under the stipulation of these bills of lading I see no difference in principle, so far as affects the consignee, between a discharge at night without notice, and a discharge by day without notice. A general authority from the consignee to discharge without notice, such as is contained in effect in these bills of lading, embraces both. If discharged by day without notice, the goods are of course liable to remain on the wharf overnight, and are liable to whatever dangers are ordinarily incident to exposure at night. Unloading at night does not increase these dangers, but rather diminishes them; since the presence of workmen at night serves as an increase of protection. If the whole cargo may rightly be landed at once by day without notice, and remain overnight, there is clearly no greater risk to the consignee in having a part discharged at night. These stipulations were designed, in my judgment, to authorize the instant discharge of cargo under general order, whether by day or by night, without previous notice to the consignee. A discharge by night, under a permit from the collector, is as lawful and as valid as a discharge by day. Both are subject to the legal duty of the ship to exercise all reasonable and appropriate care for the safety of the goods until a legal delivery to the consignees is effected; but beyond that, the consignee, under these stipulations,

took the risks of loss, including the risk of accidental fire. Neither is a discharge of cargo at night, *ipso facto*, negligence, any more than a discharge by day. If it could ever have been so regarded, it cannot be held so now; for not only has long usage sanctioned a discharge by night, but our statute (section 2871) itself sanctions it, and compels the collector to allow it, whenever duly applied for by masters or owners of vessels, after the giving of a general order. Any other construction of this clause would, in effect, nullify it altogether. For without any such stipulation, after notice to the consignee of intended discharge, and reasonable opportunity to remove the goods, the landing on the wharf would become a constructive delivery, and terminate the liability of the carrier as such, and he would be thenceforward held only for reasonable care of the goods. If, therefore, this clause did not attach, or become operative, as contended by the libelants, until after such notice, and after reasonable time for removal of the goods, the clause would be inoperative; the duties and responsibilities of the carrier would be the same without it as with it. I think the intent to modify the common-law liability by relieving the carrier of the duty of prior notice is evident. Nor have I any doubt that section 2966, Rev. St., has in view stipulations of the precise character of this, in its reference to cases where "by the bill of lading it appears that the goods are to be delivered immediately after the entry of the vessel;" in which case the collector is authorized "to take possession of the goods and deposit them in a bonded warehouse." The word "delivery" in this section cannot mean delivery to the consignee, for in that case the collector could not take and warehouse the goods; it means delivery in the sense of unlading or discharging from the ship.

The clause exempting the ship from any loss capable of being covered by *insurance* also appears to cover this case. It is invalid as applied to losses caused by the negligence of the carrier; but otherwise, so far as I can see, it is reasonable and valid. *The Hadji*, 16 Fed. Rep. 861; 20 Fed. Rep. 875. Its intention is to require the owners of cargo to insure against all insurable perils, for the common benefit, so far as to exempt the carrier from claims for losses from such perils. *Rintoul* v. *New York Cent.*, *etc.*, 17 Fed. Rep. 905. No evidence was introduced in this case to show that insurance of goods landed on the dock is procurable in the ordinary course of business, either by a separate policy, or as a part of ordinary marine insurance. I can scarcely doubt that such insurance would be procurable without difficulty in the usual channels of insurance; but in the absence of evidence on that point I give no weight to that clause in this case.

The question remains whether the ship or her owners are liable, upon the express terms of the agreement executed to the collector, in order to procure the permit for the goods "to remain on the wharf 48 hours from the time of granting general order," viz.: that the

owners of the steamer would "pay to the consignee or owner the value of such cargo, respectively, as may be stolen, burned, or otherwise lost;" and "also pay all duties on cargo which may be in any way lost by so remaining." On behalf of the steamer various objections are urged to any liability under this agreement: (1) That it is not a contract of which the admiralty has jurisdiction; (2) that the agreement to pay the owners for loss by fire was unlawfully exacted by the collector, and void, because not within the law, or the secretary's regulations; (3) that the agreement was for the collector's benefit only, and that all advantage from it to the consignees of cargo was intentionally waived by the provisions of the bill of lading; (4) that the promise is not legally available in an action by the consignees, but only at the suit of the collector, as promisee.

In my judgment the first objection is not valid. I think the contract should be regarded as being properly a maritime contract, because it was a contract made by the ship, in part, at least, for her benefit, and in relation to the means of delivering her cargo to the consignee, and in respect to her liability while her duty to make a lawful delivery of the cargo to the consignees was still incomplete. If her maritime duty to the goods could be or was, in fact, fully performed without making any use of the provisions of this contract, and before it could take effect, then I think the contract should not be regarded as a maritime one, because it would not in that case be incident to, or attached to, any maritime obligation of the ship. It is because a delivery of the goods is a part of a ship's maritime obligation that I have held a stevedore's contract with the ship for unloading a cargo to be a maritime contract. *The H. M. Bain,* 20 Fed. Rep. 389, and cases cited; *The Onore,* 6 Ben. 564; *The Velox,* 21 Fed. Rep. 479. Here, although the steamer might put the goods on the wharf under the "general order" without any special permit for them to remain there 48 hours, her duty as carrier to make delivery to the consignees would not thereby be completed. Under this special permit the ship still retained her possession and lien on the goods, subject only to the collector's possession for the purpose of collecting the duties. As soon as these duties on any part of the goods were paid or secured, her full possession and lien would be reinstated as before. Except for such a stipulation as was here given, the collector, by section 2966, *supra,* might remove the goods to the public stores at once. The ship, in order to retain the goods upon the wharf 48 hours, with whatever advantages to herself might accrue from retaining possession and making delivery there of whatever goods might in the mean time be duly entered by the owners or consignees, agreed with the collector to pay the owners if the goods should be lost by fire or otherwise during this interval. If the agreement was valid and available to the owners, I think it was, therefore, maritime in its character.

The validity of this clause of the ship's agreement with the collector depends upon whether it was in conformity with the provisions

of the statutes and of the regulations of the secretary of the treasury. If it was in excess of those provisions, it was void; for under the statutes and regulations the steamer had a right to discharge at once, by day and night; and although the collector had a possible discretion, under regulation No. 3,278, to prescribe a shorter interval than 48 hours for the goods to remain, still, if he granted permission for them to remain at all, he had no discretionary power to change the conditions prescribed by statute or by the secretary's regulations. To exact more would be unlawful constraint, and hence duress, and void. The statement of facts shows that this form of application and agreement was exacted by the collector, and that, unless that form was complied with, he would have removed or dispatched the goods at once to the public store.

I have already held that the stipulations of the bills of lading authorized the unloading at once, without notice, and at the consignee's risk of fire, and that these stipulations are valid. If the agreement with the collector has the force claimed for it by the libelant, it can only be by its changing the rights and obligations of the parties under the bills of lading, and to that extent superseding and nullifying their provisions. Such a change could only be effected by the voluntary act of the ship, or else by the provision of positive statute. It is clear that no such change was made voluntarily by the steamer, unless that change was lawfully imposed on her as a condition of permitting the goods to remain 48 hours; nor unless the agreement was intended for the consignee's benefit. If the statute, or lawful regulations, imposed such a change for their benefit, then the steamer, in applying for the permit, voluntarily acceded to this change. In my judgment there is very great doubt whether the statute and the regulation, rightly construed, impose, or permit to be imposed, any such change of the steamer's liability to the consignees, and consequently whether the collector had authority to exact any such change of liability. If he had no such lawful authority, then, so far as this agreement might be construed as affecting the rights of consignees, it would be inoperative and void, although lawful and operative in a limited sense for the collector's own protection. Section 2871 declares explicitly that "any liability of the ship-owner * * * to consignees * * * shall *not be affected* by the granting of such special license, [to land at night,] or of any general order, but *such liability shall continue until the merchandise is properly removed from the dock.*" The liability of the ship-owner to the consignee, therefore, is *not to be affected* by the granting of any general order, etc., but such liability is to *continue* till the goods are *removed*. What is this liability of the ship-owner that is to remain unaffected till the goods are removed? Clearly the precise liability as defined and fixed by the bill of lading, or by law, or by both combined. Whatever that liability may be, the granting of the general order is not to affect it, either by enlarging it or by diminishing it. By "the *granting* of the general order" is meant, not the mere

act of signing the permit alone, but all acts that lawfully belong to the proper execution of the general order itself, and necessarily or properly flow from it.

It is contended that the permit for the goods to remain 48 hours on the dock is an act independent of the general order, and hence not covered by the provision of section 2872. A "general order" is an order whereby the collector allows the unlading of goods and takes possession of them before any entry of them is made by the individual owners or consignees. By the general provisions of section 2969, the collector is required "to take due and reasonable care of such goods at the charge and risk of the owner." By section 2966, which is specially applicable to this case, the collector is to "take possession of the goods and deposit them in bonded warehouse." There is no direct statutory authority, so far as I am aware, for allowing any fixed interval of time to elapse between the unlading of the goods, whereby they pass immediately into the collector's possession, and his removal of the goods for deposit in bonded warehouse. The statute itself neither prescribes nor prohibits any such interval. But as some interval must necessarily elapse, and as there are duties in weighing, gauging, numbering, identifying, etc., which can be best performed while the goods are on the dock, and as the interests of the government, of the ship, and of the consignees, are in other ways clearly promoted by allowing some interval of time after landing and before removal, the collector, in the absence of any regulations from his superior officer, may be considered as having a lawful discretion, within reasonable limits, in regard to the moment of removal, and the length of the interval allowed in view of the various interests above referred to. The secretary of the treasury, both as the superior officer and under the express provision of section 251, has power "to make regulations, *not inconsistent with law,* to be observed in carrying out the laws for the collection of the customs duties." Under this power he has prescribed, by regulations Nos. 3,230, 3,259, 3,278, above referred to, the interval that might be allowed by the collector, and the conditions of granting it. These regulations are therefore mere limitations of the discretion of the collector in executing his statutory duties under the general order. It is only by regarding this permit as an incident to the mode of executing his duties under the general order, and therefore as an incident to the general order itself, that there is any authority in the collector, or the secretary of the treasury, to allow the goods to remain on the dock for any definite interval at all; for the secretary can make no regulation "inconsistent with law;" and section 2966 requires the collector, whenever any such general order is issued, to "take possession of the goods and deposit them in bonded warehouse." But considering the objects of this provision, and that some interval must elapse, I do not question the validity of the regulations as fixing and determining, within reasonable limits, the discretion as to time that attends the execution of the general order. In

the absence of any regulation, the collector, it is true, might remove the goods at once, and for good cause he may, perhaps, do so still; but if the 48-hour permit be granted at all, the goods remain on the dock under the general order until removal; and the statute is explicit that the ship's liability shall be unaffected "until such merchandise is properly removed from the dock;" *i. e.*, removed either by the collector to the warehouse, or by the owner on entry in the mean time. The 48-hour permit is not, therefore, *independent* of the general order, though supplemental to that order. It defines how the collector may execute his duties under it, as respects the interval before actual removal. But as the statute covers the whole period "until the goods are properly removed," the 48-hour permit would seem to be incident to the general order, and apparently covered by the statute and its restrictions.

As the law charges upon the collector, however, the duty of keeping the goods "with due and reasonable care" from the time they come into his possession, (section 2969,) and as due care of the goods is more burdensome on the wharf than in a warehouse, I see no reason why the collector may not demand of the ship, as a condition of granting a definite interval for the goods to remain on the dock, indemnity to himself for the obligation which the law imposes upon him during this interval. This would include indemnity for loss of the goods by fire, or otherwise, through any lack of "due and reasonable care," in case the collector might, by reason of such loss, be held chargeable for the goods. The vessel, in assuming that risk, would add nothing to her previous obligation; since, before any complete delivery of the goods by her to the consignee, she is already under the obligation to take "due and reasonable care" of the goods. The agreement to pay the owners for loss by fire, or otherwise, would be valid, therefore, for the collector's own benefit, so as to indemnify him for any liability to pay the owners for any loss through want of due and reasonable care. Beyond that, the statute would seem to make it invalid.

Upon the same considerations, the terms of the secretary's regulations, "that the ship shall assume the risk of the goods," should be interpreted as having reference only to such risk of the goods as is incurred by the collector and by the government; with no view to any modification of the rights and liabilities of the ship and consignees as between themselves, as fixed by the bill of lading. Nothing in the language of the regulations requires any different construction; and it ought to be construed in harmony with section 2871, and not contrary to it.

But whatever doubt may exist under section 2871 as to the validity of any agreements exacted from the ship varying her obligations to consignees, there is another consideration that seems to me controlling on this branch of the case, viz., that the stipulations of the bills of lading have anticipated all these agreements between the ship and

the collector; and in view of them all, have deliberately fixed the rights of the consignees, and waived whatever benefits from such agreements they might otherwise possibly have claimed. The procedure on the part of the steamer in this case was in accordance with long-established usage. Every step required to be taken by her was known in advance, including the forms of the application to the collector, and of the various agreements that would be exacted by him. The bills of lading were manifestly framed with reference to this usual course of procedure, and therefore in reference to these very agreements as parts of it; and the consignees are legally presumed to have contracted with reference to them. When the ship and the consignees, therefore, agree in effect, as I have held above, that on arrival the ship may obtain an immediate general order for discharge, and may discharge at once, without notice to the consignee, and at his risk of fire, provided only that the ship exercise due and reasonable care of the goods until notice and reasonable time for removal, the parties have covered by their own express agreement the precise case and the precise circumstances that have arisen; and whatever be the forms of agreement with the collector that the ship may have been compelled to enter into subsequently in order to make the discharge in the manner contemplated and previously agreed upon, so long as these forms are but the usual and customary ones, they must be regarded as foreseen and forestalled by the parties themselves, and any benefit from them waived by the express contract, so far as inconsistent with it. Such an agreement with third persons, under such circumstances, is in law *res inter alios acta*.

It is contended that the agreement with the collector, being subsequent to the bill of lading, controls the stipulations of the latter. That would be so if the subsequent agreement was between the same parties. But such is not the case here. The prior stipulations of the bill of lading were made, as I have said, with reference to the whole series of subsequent proceedings with the collector, of which the 48-hour permit, and the agreement given to obtain it, formed an anticipated and essential part. In such a case a later agreement with another person cannot control the prior one, because the parties to the latter have, in effect, agreed that it shall not do so.

It is urged, also, that the bill of lading contains no stipulation for the 48-hour permit, and no allusion to it; and that hence the agreement with the collector given by the ship in consideration of that permit is not covered by the bill of lading. But this 48-hour permit has been long in use as a part, and, practically, an essential and necessary part, of the system for immediate discharge of the ship, for which the bill of lading does expressly provide. If that permit were not obtained by means of the ship's agreement with the collector, he would, as the case states, at once remove the goods to the warehouse. But this would inflict a grievous inconvenience and expense upon all the consignees. It would neither be adopted in practice nor toler-

ated. The 48-hour permit, if considered as independent of the agreement for an immediate discharge, is more for the consignee's benefit than for the benefit of the ship. But they are not, in fact, independent. Indeed, so intimately is this permit, and the usual detention of the goods on the wharf for 48 hours, connected by custom with the immediate discharge of the ship, that it cannot for a moment be doubted that an authority from the consignees to discharge at once, imports and carries with it, by implication, an authority to obtain this permit through the customary agreement; and not only that, but should the ship refuse to give the customary agreement, and the goods, in consequence, be at once removed to the warehouse, I think the consignees might justly require the ship to pay the extra expense to which the consignees were thereby put because of the ship's refusal to procure the customary delay for removal from the dock, and thus omitting a duty imposed on her by custom in connection with the privilege for immediate discharge granted in the bill of lading. This 48-hour permit, and the ship's agreement exacted from her to secure it, have nothing, therefore, of the character of a new and independent arrangement adopted voluntarily by the ship subsequent to the bill of lading, and intended to supersede its terms. They were, on the contrary, contemplated and implied in the bill of lading from the established custom, with reference to which the authority to discharge was granted by the consignees, and the risk of accidental fire assumed by them.

Upon this view it becomes clear that the consignees can take no advantage of the customary agreement exacted from the ship by the collector, because that would be contrary to the contract in the bill of lading in reference to this very agreement. The same considerations lead to the conclusion that the agreement with the collector was not designed for the benefit of the consignees at all, notwithstanding its broad language agreeing "to pay the owners for any loss by fire," etc. For, as the consignees and the ship have, in effect, agreed upon an immediate discharge at the consignee's risk, (except reasonable care by the ship,) and as the 48-hour permit is given largely for the benefit of the consignees, and to prevent the expense and inconvenience to them that would result from an immediate removal, there is no reason why the collector should exact from the ship any agreement to vary the contract on this subject between the ship and the consignees, and no sufficient reason for construing the agreement in that sense. The collector had no interest in the matter, and no duty, except his duty to the goods, under section 2969, "to keep them with due and reasonable care." It is not necessary to decide here whether, under the peculiar language of section 2969, the collector would or would not be liable in damages to the consignees for any loss or injury to their goods through want of "due and reasonable care" of them while they were in his possession. In the absence of any decision on that point, the collector might properly demand indemnity against any liability that he might possibly incur under that

statute.   If this clause of the agreement be construed as designed to cover this possible liability, and as referring to such loss by fire as might happen through want of "due and reasonable care," that will satisfy all the interest the collector had in the subject; and that is, therefore, presumably the only intent of this clause.   This construction is further supported, not only by that part of section 2871 which says that the liability of the ship to the consignees is not to be affected by the general order, but also by observing further that the obligation required by the statute to be given by the ship in obtaining a permit for a discharge at night, exacts nothing for the consignee's benefit, but requires indemnity to the collector and to the government only.   And so section 2966, in saying that the goods shall be kept at the risk and expense of the consignees, evidently means as between the collector and the consignees, without reference to what the parties may have agreed upon in the bill of lading.

Upon all these considerations, I cannot entertain any doubt that the agreement given by the ship to the collector is neither designed nor can legally avail for any benefit to the consignees, (*Austin* v. *Seligman*, 21 Blatchf. 506; S. C. 18 Fed. Rep. 519;) that the whole case, as between these parties, is controlled by the stipulations of the bill of lading; that these stipulations, as respects fire happening without any fault of the ship, are valid; and that the libels must therefore be dismissed, with costs.