### THE FERNCLIFF.

#### No. 2155.

District Court, D. Maryland.
Feb. 10, 1938.
Supplemental Opinion March 29, 1938.

George W. P. Whip, of Baltimore, Md., and Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Charles R. Hickox, of New York City, of counsel), for libelant.

George Forbes and Henry L. Wortche, both of Baltimore, Md., and Hunt, Hill & Betts, of New York City (George Whitefield Betts, Jr., of New York City, of counsel), for respondent,

CHESNUT, District Judge.

In this admiralty case a libel in rem has been filed by H. J. Baker & Bro., against the motor vessel "Ferncliff" for damage occurring to a very large cargo shipment of fish meal from Japan to Norfolk and Baltimore. The damage is alleged to have been caused by improper stowage. The respondent denies negligence and attributes the damaged condition of the fish meal to its inherent characteristics. The case has been submitted upon voluminous testimony partly by depositions but principally by examination of witnesses in court. On the main facts with regard to the stowage, carriage and discharge of the fish meal, the case is very like The Nichiyo Maru in this court, 14 F.Supp. 727; affirmed on appeal, 4 Cir., 89 F.2d 539 (which may hereafter be conveniently referred to as the Wellman Cases), in which three Japanese ships carrying fish meal from Japan to Baltimore were held at fault in stowage. Other cases of like nature are The Willfaro, The Willsolo, D.C., 9 F.2d 940, and The Niel Maersk, D.C., 18 F.Supp. 824 (reversed on appeal for failure of the libellant to affirmatively prove good condition on delivery to the vessel) 2 Cir., 91 F.2d 932, certiorari denied Bradley v. The Niel Maersk, 302 U.S. 753, 58 S.Ct. 281, 82 L. Ed. ——, December 6, 1937.

This case must, of course, be decided on its particular facts appearing from the testimony which has taken an even wider range than in the Wellman Cases with respect to the characteristics of fish meal as viewed both scientifically and commercially. It is probable that all presently available knowledge upon the subject has

been covered by the testimony in the case. The primary question is one of fact, whether there was negligence in stowage. But in addition this case presents some important questions of law, arising on the provisions of the bills of lading, which were not involved in the Wellman Cases. The important and controlling facts here are as follows.

The libellants are engaged in a large way in the purchase and sale of feed and fertilizer goods, their main office being in New York City with branches in Baltimore and Norfolk. On December 13, 1935, they made a contract with the New York branch of a Japanese corporation, Mitsubishi Shoji Kaisha, Ltd., for the purchase, under c. i. f. contract, of from 4,000 to 5,000 tons of Japanese fish meal for delivery at certain Atlantic ports in the United States, including Norfolk and Baltimore. In the negotiations for making this contract Mitsubishi was represented by the witness Feigenbutz, and Baker & Bro. by the witness Sherry. The ship for carriage of the fish meal was not designated in the contract but the "Ferncliff" was declared by Mitsubishi shortly thereafter. The vessel was loaded at Kobe, Japan, on January 23 to 26, 1936, and a few days later additional cargo was taken on at Hakodate. In all 3,905.2 short tons of fish meal were stowed in the 'tween decks of the ship and in Nos. 2 and 4 lower holds. The other holds of the ship were fully loaded with beet pulp by Mitsubishi, which had chartered the whole ship for the particular voyage (see stowage chart filed by the respondent as Exhibit no number—with Uyeki's deposition). In due course on March 11, 1936, before the arrival of the ship, Mitsubishi tendered to Baker & Bro. an invoice for the whole cargo of fish meal in the total amount of $126,919, accompanied by the bills of lading and other documents; and the amount of the invoice was then paid by Baker & Bro. The bills of lading issued by the ship's master were "order" bills of lading and were endorsed by Mitsubishi. They made no reference to the charter party and no reference to the Harter Act, §§ 1, 5, United States Code, title 46, §§ 190, 194, 46 U.S.C.A. §§ 190, 194.

The vessel sailed from Hakodate on February 5, 1936, and arrived at Tampa, Florida, on March 16, 1936, where she discharged 20,122 bags of fish meal in good condition; and on March 20, 1936, she arrived at Pt. Everglades, Florida, where she likewise discharged 7,982 bags of fish meal in good condition. On March 24, 1936, the vessel arrived at Wilmington, North Carolina, where she discharged 14,000 bags of meal, all substantially undamaged. On March 26, 1936, she arrived at Norfolk where she discharged 20,000 bags of the meal, of which, according to libellants' testimony, 18,252 bags were damaged; and at Baltimore, March 28, 1936, the balance of the cargo of fish meal totalling 15,927 bags were discharged, 14,367 of which were alleged to be damaged. The undamaged portion of the fish meal discharged at Tampa, Florida, Pt. Everglades and Wilmington had been stowed " 'tween decks" and in the *upper portion* of lower holds Nos. 2 and 4. The damaged portion of the fish meal discharged at Norfolk and Baltimore evidently came from the lower part of holds Nos. 2 and 4.

In the course of the trial the libellants submitted affirmative testimony that all the fish meal was delivered to the ship in good merchantable condition in Japan and was fit for export; and in this respect the case differs from that of The Niel Maersk, 2 Cir., 91 F.2d 932. Libellants also submitted testimony to the effect that the meal discharged at Norfolk and Baltimore was damaged to the extent mentioned. The respondent ship then took up the burden of proof to exempt itself from the presumption of negligence in carriage and submitted testimony to show that the damage was much less than that indicated by libellants' testimony; that there had been no negligence in stowage; and that such damage as had occurred was due to the inherent nature of the fish meal when shipped. Some rebuttal testimony was then offered by the libellants. But most of the facts with regard to stowage and discharge are to be found in the respondent's testimony.

From the whole testimony I find as ultimate facts that there was negligence in the stowage of the fish meal and substantial damage as claimed by the libellants on discharge at Norfolk and Baltimore. The "Ferncliff" is a Norwegian motor vessel with length of 381 feet, 6½ inches; beam of 53 feet, 3 inches; depth of 36 feet, 9 inches, gross tonnage 4333.-06, net tonnage of 2493.59 and dead weight capacity of 7890. She has four cargo lower holds with five hatches, No. 2 hold being accomodated with two hatches; with

a 'tween deck running from stem to stern, making a compartment over each lower hold. No. 2 lower hold is 105 feet long, 51 feet wide and 25 feet deep. None of the fish meal carried 'tween decks was damaged; all the damage occurred in the lower part of lower holds Nos. 2 and 4. No other cargo was carried in these two lower holds. The bags were tiered from the ceiling (bottom) of lower No. 2 hold, on dunnage 26 to 30 bags high to within about 5 feet of the 'tween deck. In all No. 2 lower hold contained 44,833 bags which completely filled the hold with the exception of about five feet air space at the top and 18 inches at the sides and ends of the hold, three aisles of 18 inches athwartship, and a net work of rice ventilators arranged substantially as described in the Wellman Cases.[1] A generally similar condition existed in No. 4 hold which, however, was of smaller capacity. In general I find that the relative proportions of cubic contents of fish meal to air space were much the same in the case of the "Ferncliff" as in the case of the three Japanese vessels involved in the Wellman Cases, although the respondent's testimony in this case is to the effect that somewhat greater care was used in this case in the arrangement of the rice ventilators and provision for alleyways of air space. Nevertheless the fundamental fact is the same in both cases, the amount of ventilation being quite inadequate for the amount of fish meal closely stored in the lower holds and particularly the lower portion of the holds. The conclusion on the facts seems to me inescapable that the general plan of stowage was fundamentally wrong in placing such a large quantity of fish meal in these lower holds, and that merely providing rice ventilators as described in the respondent's testimony, was totally inadequate provision for ventilation. The fixed ventilators of the "Ferncliff" emerging on deck, as in the Wellman Cases, were quite adequate for general cargo in the lower holds, but of themselves not sufficient for a cargo of fish meal filling these holds. And the rice ventilators although doubtless somewhat helpful as an auxiliary ventilation were in large part dependent for their operation on the discharge of air through the hatches which often, due to weather conditions, must be kept closed.

In view of the very full discussion of the generally similar conditions in the Wellman Cases, it seems unnecessary to review the testimony in this case in further detail. The conditions are well summarized by Judge Parker on the appeal in those cases, and the applicable law is there stated and applied. I will, however, refer to the principal contentions of counsel for the respondent who again in this case so earnestly contend that negligence in stowage has not been shown. It is insisted that the deterioration of the fish meal during the voyage must have been due to inherent defect existing when delivered to the ship. And in this connection reference is made to the certificate of inspection in Japan which showed that the percentage of moisture content of the several lots of fish meal loaded at Kobe ranged from 8.9 to 10.51, it being contended, based on the testimony of Dr. Manning, that 7% is the maximum amount of moisture which can be safely present in fish meal. Dr. Manning is a chemist of the Fisheries Bureau of the Department of Commerce and for several years has made a special study of the characteristics of fish meal. In this respect he is a

---

[1] A more particular description as given by the respondent is as follows: " * * * but there were 3 equi-distant athwartship alleyways each 18 inches wide from the ceiling for the full depth of the hold, making 4 piles in No. 2 and 2 piles in No. 4. The forward and the after bulkheads were each distant from the cargo 18 inches, and on the starboard, as well as the port side there was a 10 to 12 inch air space between the cargo and the skin of the ship. The air space below was about five inches and above about 5 feet.

"In addition to the 3 athwartship alleyways, there were wooden rice ventilators 6 by 6, open on 2 sides, except for diagonal braces, which were run fore and aft every tier of 3 bags and athwartship every 4 feet, which was repeated every tier of 3 bags, and all of which rice ventilators and air spaces were connected up to 18 inch vertical ventilators leading to the 4 open corners of No. 2 hatch, and the forward 2 open corners of No. 3 hatch. In addition, there were six 2 by 2 vertical ventilators leading to the trimming hatches in the 'tween decks, which areas were kept open for free egress of air to the weather deck hatch. Two of the permanent ventilators acted as exhausters through which many of the rice ventilators also exhausted. These permanent ventilators rose 12 feet above the main deck."

well qualified witness and his information and opinion can well be studied with advantage by those dealing commercially with the product. He did not testify in the Wellman Cases. The substance of his extended expert testimony, submitted by the respondent, is to the effect that from the scientific standpoint conditions of stowage of fish meal on ships ought not to be substantially different from storage in warehouses on land, and that he has found from his studies and observations that fish meal with a moisture content of not greater than 7% is secure from deterioration under any ordinary condition of ventilation; but that fish meal containing a higher percentage of moisture is relatively unstable in its composition, and in storage, whether on land or sea, is very liable to deterioration from its inherent quality. In his opinion the safe transportation of fish meal with a higher content of moisture than 7% in a voyage of several weeks from Japan to Atlantic ports of the United States is due only to "good luck." But in this respect his opinion is opposed to the great weight of testimony in the case based on actual experience in the commercial handling of fish meal, whether limited to ship voyages of a few days from port to port on the Atlantic seaboard, or when related to transportation from Japan to the United States. The Mitsubishi Corporation has been engaged very extensively in the importation of fish meal from Japan since 1931, during which time it has imported or sold to other importers 300 to 400 separate shipments, about 95% of which have arrived without damage, with varying moisture content up to at least 11%. Numerous trade witnesses have testified that a moisture content up to 12% does not render fish meal unmarketable; and a number of specific instances have been cited in the testimony of the various witnesses to the effect that fish meal with moisture content varying from 8% to 11% when stowed with reasonably adequate ventilation has been kept undamaged for many months.

While it is probable that the scientific knowledge with respect to the characteristics of fish meal will increase in the future, the weight of the testimony in this case seems quite clearly to establish the following conclusions: (1) That fish meal of not more than 7% moisture is almost certainly stable despite very adverse conditions of ventilation; (2) fish meal containing more than 7% and not more than 11% or 12% is relatively safe from deterioration if afforded adequate ventilation; (3) if containing more than 12% moisture it is almost certainly sure to deteriorate in time; (4) the exact amount of ventilation required for the safe ship transportation of fish meal may not be known but it is reasonably clear that the practically complete filling of the lower holds of a ship with a nearly solid mass of fish meal allowing for no more ventilation and air access than was provided in the Wellman Cases and in this case, is inadequate ventilation. In this case the libellants were not under the obligation to show what would have been safe stowage, but only that the particular stowage was not safe.

The respondent points out that the atmospheric temperature in the lower holds during the voyage was at no time excessive. But it would appear from the scientific information that the temperature of the air surrounding fish meal is not of itself a very important factor. The heating of the meal is due to its oily nature and chemical composition which is self-generating of heat, and will cause damage unless there is ample circumambient air to conduct away the heat so generated within the substance itself. The chemical reason for the self-heating is due to two causes, oxidation of the oil in the meal, and the "microbial thermogenesis" occasioned by the moisture content. The necessity for very adequate ventilation is to carry off the heat so chemically generated. And in this connection it is importantly to be noted that not only must there be a sufficient amount of air in the ship's hold in proportion to the cubic contents of the whole of the fish meal stowed in the holds, but also that each of the bags of meal should be sufficiently in contact with surrounding air to allow its self-generated heat to be conducted away. Or, as one of the witnesses put the matter, circulation of air is as important as amount of air. And it is evident that a system of rice ventilators, even when arranged with much care, is not adequate to provide the needed amount of circulation of air for an otherwise dense mass of fish meal in the lower holds of ships, unless the moisture content is far lower than is commonly accepted by commercial standards.

This phase of the case was well summarized by Judge Parker in the Wellman Cases, 4 Cir., 89 F.2d 539, 543, as follows:

734

"There can be no question, of course, but that the heating occurred because of the inherent quality of the fish meal and not from some external source; and the provisions of the bills of lading would exempt the carrier from liability on that account in the absence of negligence on its part. But the fact that damage to goods arises out of their inherent nature constitutes no defense to the carrier, under such a provision, if it appears that the damage would not have occurred but for the carrier's negligence. Schnell v. The Vallescura, 293 U.S. 296, 305, 55 S. Ct. 194, [196] 79 L.Ed. 373. In other words, if the carrier here had used due care in the stowage of this fish meal, it would not have been liable for damage due to heating which occurred because of the inherent nature of the meal; but where, with knowledge of the propensity of the meal to heat unless properly stowed, it failed to exercise due care in stowage to prevent heating, it is liable for the damage from heating due to such improper stowage. In such case, the negligence of the carrier, without which the heating would not have occurred, is considered the proximate cause of the damage to the cargo."

The respondent points to the fact appearing in the testimony that the Hakodate portion of the fish meal was discharged undamaged, and that its moisture content ranged from 7.5 to 7.99%, which was somewhat less than that of the Kobe meal, (but also definitely greater than the safe percentage according to Dr. Manning). But it will also be noted that its condition of stowage was more favorable than that of the Kobe meal. Most of the Hakodate cargo was stowed 'tween decks (where it is well recognized that conditions of ventilation are better than in the holds) and the remainder at the top of the lower holds; and there is testimony to the effect that those portions of the Kobe meal stowed in the lower holds on a level with the Hakodate cargo were also discharged practically undamaged.

There is another important consideration in this case which substantially supports the libellant's position as to negligence of stowage. The master and officers of the "Ferncliff" had had no prior experience in the handling of fish meal. They left the matter of stowage entirely to Mitsubishi, as was expressly stipulated in the charter party. Mitsubishi was not only the shipper of the fish meal but also the manufacturer thereof and had entire charge of the plans for the stowage in the ship and furnished the actual stevedoring work therefor. The master of the ship took no part in the actual stowage but merely issued bills of lading therefor as required by the charter party and "without prejudice" to it. It also appears that Mitsubishi as an exporter in Japan and an importer in New York, had had very wide experience in cargo shipments of fish meal over a period of several years. And in addition thereto it appears specifically from the testimony of their representative, Feigenbutz, that the particular shipment was an exceptionally large one to be carried in one vessel and that stowage of very large quantities of fish meal in the lower holds of ships was at least risky. In view of the large quantity to be carried it was necessary for Mitsubishi to specially charter a whole ship; but instead of distributing the whole of the fish meal throughout the several lower holds of the ship, two of the four lower holds were fully loaded with beet pulp. It also appears from the testimony that Mitsubishi realized that more than usual care would have to be exercised in the stowage of this large quantity of fish meal in one ship; and indeed unusual care seems to have been exercised in the arrangement of the rice ventilators and in allowing some free space in the lower holds at the sides and ends and top of the material. But as has been pointed out, the defect in stowage was not in lack of care in the arrangement of the rice ventilators, but consisted in the totally inadequate ventilation and circulation of air for the comparatively dense mass of meal stowed in the lower holds. Very probably the extra care taken with the arrangement of the rice ventilators and alleyways did somewhat mitigate the actual damage to the meal in transportation which seems to have been somewhat less in extent than the damage in the Wellman Cases. But the negligence was in the general plan of stowage rather than in the arrangement of the details. And it seems probable that all damage could have been avoided by stowing some of the fish meal in the lower holds occupied by the beet pulp instead of massing it all in lower holds Nos. 2 and 4.

While the ship's master was not consciously or wilfully negligent in the

matter of stowage the ship owner must be held to its legal responsibility. As was said by Judge Parker in 89 F.2d 539, 542:

"The rule applicable in such cases was well stated by Judge Northcott, speaking for this court, in Bank Line, Ltd. v. Porter (C.C.A.4th) 25 F.2d 843, 845, as follows: 'The law imposes upon owners of ships the duty of using due care to ascertain and consider the nature and characteristics of goods offered for shipment, and to exercise due care in their handling, including * * * such methods as their nature require.'"

As the ship owner delegated its responsibility for the ship loading to Mitsubishi, it cannot escape liability under its bills of lading for improper stowage by Mitsubishi; and as the latter probably has had the widest experience in this particular industry, it seems clear that it should have known how the meal could have been safely stowed. Particularly it must have known that the mass storage of fish meal in lower holds was hazardous, as was illustrated in the Wellman Cases which occurred two years before. And as Mitsubishi was also the manufacturer of the meal and therefore must have known its inherent qualities, the negligence in stowage seems to be emphasized if, as the respondent contends, the meal was not in such condition that it could be safely transported to the United States.

The respondent also contends that the damage to the fish meal should be attributed to an excessive percentage of oil content. Reference is here made to the expert scientific opinion of Dr. Manning that a safe oil content is not above 7%, and in supposed contrast therewith reference is further made to the analysis certificate by Dr. Holland of some samples of the damaged meal unloaded at Baltimore which contains the line "available oil 10.65." But the significance of this figure is not clear as the witness was not examined with regard to it, and it appears in the evidence only because it appears to have been physically attached to the "joint report of Wiley & Co., and Gascoyne & Co." (chemists of Baltimore), which deals with the content of free fatty acids in the samples as indicative of their damaged condition. I am unable to conclude from this meagre detail in evidence that the fish meal found to be damaged on discharge at Baltimore and Norfolk contained a commercially excessive amount of oil at the time of its shipment in Japan, especially in view of the affirmative testimony based on the Japanese inspection that the meal was in good and merchantable condition and fit for export when delivered to the ship. The analysis certificate there given offered in evidence did not state the percentage of oil content, and other testimony in the case shows that this is not a customary requirement in commercial usage. Dr. Simmons, an expert chemist testifying for the respondent, analyzed 12 supposedly representative samples of the fish meal, most of them damaged but some not damaged; but did not undertake to find or report the oil content. He found the average moisture content of all twelve to be 7.83. I therefore do not find any satisfactory evidence in the case that the oil content of the fish meal when delivered at the Japanese points was commercially excessive.

There was also a contention submitted by the respondent based on the testimony of Feigenbutz and Sherry respectively that the libellants, Baker & Bro. must have known what would be the condition of stowage of this very large shipment of fish meal. Feigenbutz testified to the effect that in negotiations leading to the making of the contract, Sherry said that he supposed a lot of it would have to be carried in lower holds and that it would be a wonder if the meal arrived in good condition. This is specifically denied by Sherry. It is argued that the testimony of Feigenbutz in this respect practically put the safe carriage of the meal at the risk of Baker & Bro. I am not disposed to accept this as the proper conclusion from the testimony of Feigenbutz in view of the situation of the parties. The contract made no specification with regard to the particular method of shipment or stowage or even that Mitsubishi should charter a whole ship. It is probable that Sherry anticipated that in view of the size of the shipment Mitsubishi would charter a ship, but the contract did not so require. The obligation to make shipment of good merchantable fish meal and arrange for proper marine transportation was on the seller and not the purchaser. Furthermore to the extent that the conflict between the two witnesses is important, I feel that I should accept Sherry's testimony in this respect as more probable in view of their respective situations.

So much for the facts. I turn now to the questions of law arising on the

special provisions of the bills of lading. They were clean bills of lading issued "to order" by the ship in Japan upon the loading of the cargo and were delivered to Mitsubishi there and forwarded to New York and then delivered to Baker & Bro. with the endorsement of Mitsubishi both in Japan and in New York, upon payment of the draft for the invoice. The bills of lading, which were in English, contained no reference to the charter party, the terms of which were in fact unknown to Baker & Bro. and also contained no reference to the Harter Act, 46 U.S.C.A. §§ 190–195, although the charter party made the ship subject thereto. Nor were the printed provisions of the bills of lading containing exemptions of the ship from liability read or known to Baker & Bro. at the time of payment of the draft, although the libellants on familiar legal principles must be held by such of these provisions as were valid. The bills of lading also contained a provision that they were to be construed in accordance with the laws of Japan but as there has been no proof made by counsel in this case as to the law of that country, it results that they must be interpreted in accordance with our general mercantile law as affected by applicable statutes. The Arizpa, 4 Cir., 63 F.2d 42, 43; Heredia v. Davies, 4 Cir., 12 F.2d 500; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 444, 9 S.Ct. 469, 32 L. Ed. 788. Compare E. Gerli & Co. v. Cunard S. S. Co., 2 Cir., 48 F.2d 115. I understand counsel to so agree. Cuba Railroad Co. v. Crosby, 222 U.S. 473, 32 S.Ct. 132, 56 L.Ed. 274, 38 L.R.A.,N.S., 40, dealt with a different situation, involving a tort suit arising from an accident occurring in a foreign country. Here we are concerned with foreign commerce with the United States. See, also, Knott v. Botany Mills, 179 U.S. 69, 77, 21 S. Ct. 30, 45 L.Ed. 90, as to the applicability of the Harter Act.

 *Was the ship subject to the Harter Act?*[2] One of the conditions printed on the back of the bills of lading read as follows:

"2. Neither the ship, nor the carrier shall be responsible for loss of or damage to or in connection with goods arising or resulting from * * * chemical action, fermentation, change of character, mould, * * * or any other loss or damage arising from inherent defect, quality or vice of the goods, * * * heat, heating, * * * error in judgment, negligence, or default of pilot, master, officers, engineers, crew, stevedores, or other persons in the service of the ship and/or carrier, whether in the navigation or in the management of the ship or otherwise."

The damage in this case arose from heat or heating of the fish meal caused by chemical action and the carrier was therefore exempt from liability from that cause of damage, unless due to its own negligence in stowage. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; The Nichiyo Maru, 4 Cir., 89 F.2d 539, 543. But, as negligence in stowage is found to have been the cause of the damage, the carrier is liable in this case unless there is some valid exemption from liability in the bills of lading. Such an exemption from the results of negligence is said to be provided for in the concluding lines of the condition just quoted. It will be observed that the stipulation against negligence includes that of "stevedores or other persons in the service of the ship and/or carrier whether in the navigation or in the management of the ship or otherwise." The libellant points out that negligence in stowage is not included in the expression "navigation or management of the ship" (see The Vallescura, 293 U.S. 296, 303, 55 S.Ct. 194, 79 L.Ed. 373); but the respondent points to the expanding phrase "or otherwise" particularly in connection with the word "stevedores" whose particular function is, of course, the loading of the ship. While the question of construction is perhaps not free from all doubt it will be assumed for the purpose of the case that the condition is literally sufficient to exempt the ship from its own negligence in the matter of stowage.

The question of law is thus presented whether this condition is valid. Clearly the stipulation is invalid if the Harter Act is applicable because section 1 of the act, United States Code, title 46, § 190, 46 U.S.C.A. § 190, provides:

"It shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any

---

[2] The carriage in this case was prior to the effective date of the federal Carriage of Goods by Sea Act, 46 U.S.C., §§ 1300–1315, 46 U.S.C.A. §§ 1300–1315.

bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect."

And section 2 of the act, United States Code, title 46, § 191, 46 U.S.C.A. § 191, likewise prohibits conditions in bills of lading:

"* * * whereby the obligations of the master, officers, agents, or servants to carefully handle and stow her cargo and to care for and properly deliver same, shall in any wise be lessened, weakened, or avoided."

The statute applies to a vessel transporting goods from a foreign country to the United States. Knott v. Botany Worsted Mills, 179 U.S. 69, 21 S.Ct. 30, 45 L. Ed. 90.

The ship contends that these sections of the Harter Act are not applicable because, the ship having been wholly chartered for this voyage by Mitsubishi, was a private and not a common carrier. The Robin Gray, 2 Cir., 65 F.2d 376; The Westmoreland, 2 Cir., 86 F.2d 96; The Agwimoon, D.C., 24 F.2d 864, affirmed Atlantic Gulf & West Indies Steamship Lines v. Interocean Oil Co., 4 Cir., 31 F. 2d 1006; The Pawnee, D.C., 205 F. 333; Sumner v. Caswell, D.C., 20 F. 249; The Wildenfels, 2 Cir., 161 F. 864; The C. R. Sheffer, 2 Cir., 249 F. 600, 602. And it has been frequently held that a private carrier by water may make its own contract for carriage including an exemption from liability for its own negligence, and will not be bound by the Harter Act unless it is expressly incorporated in the charter agreement. The Fri, 2 Cir., 154 F. 333; The G. R. Crowe, 2 Cir., 294 F. 506; The Ft. Gaines, D.C.Md., 24 F.2d 849, 851, affirmed on appeal under the name of Federal Forwarding Co. v. Lanasa, 4 Cir., 32 F.2d 154; Koppers Conn. Coke Co. v. James McWilliams Blue Line, 2 Cir., 89 F.2d 865; The Oakley C. Curtis, 2 Cir., 4 F.2d 979. This contention, however, seems untenable as I find on examination of the charter party that it provides—"It is also mutually agreed that this contract is subject to all the terms and provisions of, and all the exemptions from liability contained in an Act of Congress of the United States approved on the 13th day of February, 1893, entitled 'An Act Relating to Navigation of Vessels, etc.'" (the Harter Act). As the ship is basing its position in this respect on the charter party, it cannot escape the particular provision of the charter with regard to the Harter Act. The Agwimoon, D.C., 24 F.2d 864; Atlantic Gulf & West Indies S. S. Lines v. Interocean Oil Co., 4 Cir., 31 F.2d 1006; The Framlington Court, 5 Cir., 69 F.2d 300, 304; The Westmoreland, 2 Cir., 86 F.2d 96; The Ettore, 2 Cir., 62 F.2d 769, 1933 A.M. C. 323, 329.

Moreover the libellants are the holders of negotiable clean bills of lading which contain no reference to the charter party; and it is not otherwise established that they had knowledge or notice that the ship, as between itself and the charterer, was a private carrier. The libellants, therefore, contend, as holders of these negotiable bills of lading issued by the ship, they were entitled to presume that the ship was a common carrier subject to the Harter Act, and that their rights are established by the bills of lading even without reference to the charter party. See Carver on Carriage of Goods by Sea 7th Ed., §§ 152, 160; Scrutton on Charter Parties and Bills of Lading, 13th Ed., pp. 191, 192; The Field Line v. So. Atlantic S. S. Co., 5 Cir., 201 F. 301; Crossman v. Burrill, 179 U.S. 100, 109, 110, 21 S.Ct. 38, 45 L.Ed. 106; The Querini Stamphalia, 5 Cir., 19 F. 123; The Owego, 2 Cir., 270 F. 967; The Pietro G., D.C., 39 F. 366; The Titania, 2 Cir., 131 F. 229, 231; Venezuelan Meat Export Co. v. United States, D.C.Md., 12 F.Supp. 379, 386.

Whether the conditions in this bill of lading are subject to the Harter Act, is the most interesting question of law arising in this case, and on the point so presented (apart from the clause in the charter party regarding the act) there is seemingly no direct judicial authority. But viewing the matter from the standpoint of principle and policy, it is my opinion that negotiable bills of lading issued by a ship master in international commerce with this country, must be held subject to the Harter Act in the absence of knowledge on the part of the holder for value to the contrary. Much of the shipping of the world

is done on the faith of bills of lading under c. i. f. contracts.[3] It is highly essential to this form of commerce that the purchaser of goods shall be entitled to rely upon clean bills of lading free from equities in favor of the ship as against a charterer, in the absence of notice to the contrary. Such commerce would be greatly hampered if the rule were to the contrary.

It will be noted that the Harter Act is not in terms limited to common carriers, and its inapplicability to private carriers has been established by judicial decisions which have been based on the reasoning that the ship and the charterer may make their own agreement as they are the only parties then involved; but this reasoning is not applicable to the situation of an innocent bona fide holder of clean bills of lading issued by the ship. So far as I have been able to ascertain all the cases in which a ship under a charter party has been held not subject to the Harter Act because a private carrier, have involved suits arising directly between the charterer and the ship. Possibly The Robin Gray, 2 Cir., 65 F.2d 376, may be thought to present an exception. The controversy there was between the ship and the holders of its bills of lading, where the ship was suing to recover unpaid freight which, however, by the bills of lading had been noted as prepaid. It was held that the Federal Bill of Lading Act, § 1, 49 U.S.C. § 81, 49 U.S.C.A. § 81, was not applicable because the ship in that case was not a common carrier; but it will be noted that what was finally decided was that the ship was estopped to dispute the notation as to prepaid freight contained in the bills of lading. The case therefore is not opposed to the principle stated because the situation here is reversed. That is, here the indorsee of the bills of lading is suing the ship and relying on the bills of lading as presumptively subject to the Harter Act. See, also, another case of The Robin Gray, 2 Cir., 65 F.2d 375. The Harter Act was a formulation of a definite policy intended to be applicable to marine commerce "from or between ports of the United States of America and foreign ports," and was enacted to free that commerce from the hampering conditions frequently found in marine bills of lading purporting to exempt the ship from almost all and every kind of liability. Its judicially determined inapplicability to private carriers is consistent with the legislative policy only if its inapplicability is restricted to the original parties to the contract of private carriage and those who have knowledge or notice thereof. See The Delaware, 161 U.S. 459, 470, 16 S.Ct. 516, 40 L.Ed. 771. I hold, therefore, in this case, that the ship is not exempt from claims for damage caused by negligent stowage. This holding is in accord with the policy and provisions of the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315, 46 U.S.C.A. §§ 1300–1315, April 16, 1936, 49 Stat. 1207, though not in effect at the time of the issuance of the bills of lading in this case, and not retroactive. See particularly sections 1305, 1306.[4]

[3] For the legal characteristics of and the rights of the parties inter sese under a c. i. f. contract, see Williston on Sales, 2nd Ed. §§ 280c-f, and 280j(10); and Thames & Mersey Ins. Co. v. United States, 237 U.S. 19, 26, 35 S.Ct. 496, 59 L.Ed. 821, Ann.Cas.1915D, 1087.

[4] A recent commentator on "Ocean Bills of Lading" (Knauth, p. 128, 129, American Maritime Cases Inc., publishers, 1937) takes the view that, in this respect, the Carriage of Goods by Sea Act has modified the former admiralty case law with regard to private carriers. This view seems not to have been based on the legislative history of the act, which is not referred to, but on certain decisions in the Second Circuit, The G. R. Crowe, 294 F. 506; The Ettore, 62 F.2d 769, 1933 A.M.C. 323; Westmoreland, 86 F.2d 96, 1936 A.M.C. 1680, and Blue Crest, 89 F.2d 865, 1937 A.M. C. 719. The particular point here under discussion was, I think, not ruled in those cases. All but The Ettore, supra, were suits between the ship and its charterers. The Ettore, supra, was a suit by the ship against the cargo for general average contribution, where bills of lading had been issued to consignees other than the charterer. Among other contentions the ship unsuccessfully claimed under a provision in the bill of lading inconsistent with the charter party. Judge Learned Hand said (62 F.2d 769, at page 773, 1933 A.M.C. 323, at page 329), "Again, though the bills of lading came into the hands of consignees, who might possibly invoke the more favorable code, if they were suing, any such right would rest in estoppel; when the ship makes claim against them, she is bound by the charter." In Carver on Carriage of Goods by Sea, 7th Ed., § 275, it is said, "And even though the shipper may be estopped by his acts at the time of shipment, from complaining of the stowage, the same is not, it seems, true with re-

Counsel for the respondent contends that the testimony of Feigenbutz and Sherry, above referred to, shows that Baker & Bro. the libellants, had knowledge or notice of the charter party and therefore must be held to have known that the "Ferncliff" for this voyage was a private and not a common carrier. But I do not so appraise the testimony. In view of the contemplated very large cargo of fish meal Sherry doubtless knew that Mitsubishi would have to arrange for large shipping space and very possibly might have to charter a vessel. But the problem of adequate transportation was one for Mitsubishi to solve and it was at liberty to do so without restriction in the contract; and the ship was not declared until after the contract had been made. The bills of lading did not refer to the charter party and I find nothing in the testimony to show that Baker & Bro. had knowledge 'or notice of its terms so as to effect them with notice that the bills of lading were issued by a private as distinct from a common carrier. And it is importantly to be noted that even if the libellants should be held to notice of the charter party, it expressly provided that the ship was to be subject to the Harter Act; and therefore they would have had the right to assume that the ship could not validly stipulate against negligence in stowage. I do not understand counsel for the respondent to deny that the bills of lading in this case were to be treated as fully negotiable instruments in the hands of Baker & Bro. if they were in fact not chargeable with notice of the charter party. Their position is that the ship must be treated as a private carrier despite the negotiability of the bills of lading. [5]

The ship also sets up as a defense to the claim the provisions of paragraph 22 of the printed conditions of the bill of lading. The clause provides:

"22. The ship, and/or carrier shall not be liable for any claim unless the notice thereof be given in writing to their agents at the place of delivery before removal of the goods from the custody of the ship or carrier * * * unless written claim

gard to an indorsee of the bill of lading to whom the goods have passed, without notice of any agreement or act creating such an estoppel." Ohrloff v. Briscal (The Helene, 1866) per Dr. Lushington in the High Court of Admiralty, L.R. 1 P.C. 231, 235, is cited in support of the text; but on appeal the Privy Council did not rule on the particular point as it found no negligence by the ship.

[5] At common law a bill of lading was regarded as quasi-negotiable only; and there were situations in which a bona fide holder was subject to equities in favor of the ship as against the charterer or shipper. The Carlos F. Roses, 177 U.S. 655, 665, 20 S.Ct. 803, 44 L.Ed. 929; Pollard v. Vinton, 105 U.S. 7, 26 L.Ed. 998; 58 C.J. 368. But this limitation on the full negotiability of bills of lading was not satisfactory to modern commerce, and to change it, Congress provided otherwise in the Federal Bill of Lading Act, § 31, U.S.C. title 49, § 111, 49 U.S.C.A. § 111, which reads:

"Title and right acquired by transferee of order bill. A person to whom an order bill has been duly negotiated acquires thereby—

"(a) Such title to the goods as the person negotiating the bill to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the consignee and consignor had or had power to convey to a purchaser in good faith for value; and

"(b) The direct obligation of the carrier to hold possession of the goods for him according to the terms of the bill as fully as if the carrier had contracted directly with him."

And as of 1936 a similarly worded provision, section 32, had been adopted by 27 of the 48 states in the Uniform Bills of Lading Act. See Uniform Laws Annotated, Vol. 4, Bills of Lading. The Federal Act, § 1, U.S.C. title 49, § 81, 49 U.S.C.A. § 81, does not cover a bill of lading issued in a foreign country for shipment of goods to the United States, but the Uniform Bill of Lading Act is in force in Maryland, Code 1924, art. 14, § 32, where the discharge of part of the damaged cargo was made, and in New York, section 218 of the Personal Property Law, Consol. Laws, c. 41, L.1911, c. 248. The bills of lading in this case were negotiated to the libellants in New York; and there is some authority to the effect that the Uniform Bill of Lading Act there in force would apply. Voghel v. New York, etc., R. Co., 216 Mass. 165, 103 N.E. 286. In the absence of proof as to the law of Japan where the bills of lading were issued, or of the law of the flag of the ship, if that could be thought applicable, it seems permissible to apply the general mercantile law of this country which may now fairly be taken as giving substantially full negotiability to the order bills of lading in most jurisdictions.

be likewise presented within sixty days of the date of such notice."

I find that written notice of claim was given to the ship at Baltimore before removal of the goods, and either written or telephone notice was given at Norfolk, and in both cases the ship or its agents promptly sent representatives to inspect the damaged cargo. At the same time and before the complete extent of the damage was ascertained, the claimants in writing indicated the probable extent of the damage but did not itemize it or present a claim in final detailed form within sixty days thereafter. If this preliminary or approximate claim was not a sufficient compliance with the clause (see A. Russo & Co. v. United States, 5 Cir., 40 F.2d 39; The West Arrow, 2 Cir., 80 F.2d 853, 1936 A. M.C. 165, 170), in my opinion the written claim referred to was clearly waived by the letter of the ship's agent dated April 23, 1936, written before the expiration of the sixty days to the claimants in answer to the written notice of claim, by which the ship wholly disclaimed any responsibility for the damage, and made no reference to the necessity for a further written claim; and that position was repeated in the respondent's original answer in the case without setting up the now insisted on requirement, which first appears in the supplemental answer. This constituted an estoppel as well as waiver. Oelbermann v. Toyo Kisen, 9 Cir., 3 F.2d 5; 58 C.J. 437; Royal Ins. Co. v. Martin, 192 U.S. 149, 162, 24 S.Ct. 247, 48 L.Ed. 385; Richards on Insurance, 4th Ed., § 130.

Such cases as Southern Pacific Co. v. Stewart, 248 U.S. 446, 39 S.Ct. 139, 63 L.Ed. 350; Grace & Co. v. Panama R. Co., 2 Cir., 12 F.2d 338; The Mauretania, 2 Cir., 84 F.2d 408, and The Lake Orange, 2 Cir., 22 F.2d 898, 1928 A.M.C. 186, are clearly distinguishable, as they involved no element of estoppel, the denial of liability being after the period allowed for the notice or claim, and the alleged waiver being only implied, and not express. In The J. Luckenbach, 2 Cir., 65 F.2d 570, 574, the denial of liability also reserved all defenses.

 *Regarding the Insurance.* The ship also relies on paragraph 24 of the bill of lading, which reads:

"24. The ship and/or carrier shall not be liable for loss of or damage to the goods capable of being covered by insurance and if liable they shall be entitled to the benefit of the insurance on said goods and deduct from any claim made therefor the amount of any payments made by or on behalf of the insurer to the shipper, consignee and/or owner of the goods, whether under the guise of advances, loans or otherwise."

Under this paragraph the ship makes two points, first, that as the loss to the goods was capable of being covered by insurance, the libellants can recover nothing in this case irrespective of whether there was valid insurance or not, and secondly, that at least any insurance collected must be credited on the claim. As to the first contention, it has been held, properly I think, that the clause is not a defense to liability when occasioned by negligence. The Titania, D. C., 19 F. 101; The Egypt, D.C., 25 F. 320, 329; The Anna, D.C., 223 F. 558, 560; The Turret Crown, 2 Cir., 297 F. 766, 778; Inman v. South Carolina R. Co., 129 U.S. 128, 139, 9 S.Ct. 249, 32 L.Ed. 612; Phœnix Ins. Co. v. Erie & Western Transp. Co., 117 U.S. 312, 323, 6 S.Ct. 750, 29 L.Ed. 873. But on the second point I think it entirely clear that the shipper is entitled to credit on the claim for the net proceeds of the insurance in this case collected by the libellants.

The feature of adequte insurance coverage is a vitally important element of the c. i. f. contract; and the testimony in this case shows very clearly that the libellants in the negotiations for and conclusion of their contract with Mitsubishi, placed very important reliance upon first class insurance, which should specifically cover "heat, sweat and mould." It appears that such insurance has long been customarily issued in this country on marine shipments of fish meal. But Mitsubishi in this case tendered German insurance underwriters, as American insurance was apparently not available for a satisfactory premium. Baker & Bro. naturally insisted that the insurers should be in every way responsible, and by correspondence supplemental to the contract Mitsubishi expressly agreed the underwriters would be responsible, and be represented in this country where the loss, if any, would be adjusted. But after the loss occurred and the insurers were notified, it appeared that they were not represented here by an adjuster but only by a surveyor, and they at first declined to recognize the claim as made because thought excessive, and

subsequently denied liability on the ground of alleged negligence by Mitsubishi, who had obtained the insurance, in loading the ship, basing their position on a provision of German law said to be applicable to the policy. However, after protracted negotiations, the libellants, through their London representatives, succeeded in effecting a compromise adjustment with the underwriters whereby the latter agreed to pay a maximum of $15,000 in settlement of the loss claim, which as then made was in the amount of about $26,000, and waived any claim to subrogation. So far the libellants have realized from this source the net sum of $13,113.25, after deduction of a 10% payment to their London representatives. One underwriter liable for $386.75 has not yet made payment owing, it is said, to some money exchange difficulties in a, foreign country. The claim against the ship should not be credited with this latter outstanding amount until actually received, but when hereafter received the ship will be entitled to credit therefor. Counsel for the libellants does not now dispute that the net proceeds of the insurance realized by the libellants should be credited on their claim against the ship. Great Lakes Transit Corp. v. Interstate S. S. Co., 301 U.S. 646, 654, 57 S.Ct. 915, 918, 81 L.Ed. 1318; Luckenbach v. W. J. McCahan Sugar Co., 248 U.S. 139, 146, 39 S.Ct. 53, 63 L.Ed. 170,-1 A.L.R. 1522; Inman v. South Carolina R. Co., 129 U.S. 128, 9 S.Ct. 249, 32 L.Ed. 612; The Turret Crown, 2 Cir., 297 F. 766, 767; Phœnix Ins. Co. v. Erie & Western Transp. Co., 117 U.S. 312, 6 S.Ct. 750, 29 L.Ed. 873. The respondent also contends that. as the compromise settlement with the insurers was made without notice to it, it is thereby discharged from liability, but this is untenable, for one reason, because it had previously denied any liability.

■■■■ *Measure of damages in this case.* The libellants' claim is for damage to 1630.95 tons of fish meal. The market price for the goods at the time of arrival and discharge in Baltimore and Norfolk, if they .had been in sound condition, was $36 per ton. A relatively small part of the cargo discharged at Norfolk and Baltimore was found in good condition and is not embraced in the claim, but the damage throughout much the greater part was found so extensive and pervasive of the whole that it was considered impracticable in view of probable expense to make further segregation. The libellants and to some extent the surveyor for the underwriters at Baltimore, immediately made efforts to secure bids for the damaged portion of the cargo. The best offer then obtainable was at the rate of $21 per ton, but sale at this price was not assented to either by the underwriters or by the ship's representative as they considered it an inadequate price. Finally in about thirty days further efforts by the libellants resulted in obtaining an offer of $25 per ton for the whole of the damaged material and it was then sold at that price. The respondent contends that included in the sale were 2,000 bags or 20 tons which should have been regarded as sound, but I am satisfied from the testimony that the price of $25 per ton for the whole lot of the damaged meal was a reasonably fair price. On the other hand, the libellants contend that they are entitled to recover the difference between the market value of the sound material and the contemporaneous bids of $21 per ton made immediately after the discharge at Norfolk and Baltimore, which they say was the then market price. As to this, however, I take the view from the testimony that there was really no definite market price for such a large mass of partially damaged fish meal, and that the price of $25 per ton shortly afterwards realized, represented the fair value of the goods at the time. The libellants also sustained certain expenses at Norfolk and Baltimore in handling the damaged goods including labor, survey charges and storage and wharfage expenses, totalling in all $2,114.63. The fairness of these items was not really disputed by the respondent at the trial.

There is one remaining figure necessary for the computation of damages, and its determination presents a rather difficult question of law. While the market value of the sound goods when discharged was $36 per ton, the ship sets up the special rule for computation of damage contained in paragraph 23 of the printed conditions of the bill of lading which reads:

"All claims for which the ship and/or carrier may be liable shall be adjusted and settled on the value declared by the shipper or on the net invoice cost plus disbursements, whichever shall be the least. The carrier shall not be liable for any profit or consequential or special damages, and shall have the option of replacing any lost or damaged goods."

The respondent contends that the clause is invalid on grounds of public policy, and in support thereof cites The Ansaldo San Giorgio I v. Rheinstrom Bros. Co., 294 U.S. 494, 55 S.Ct. 483, 79 L.Ed. 1016. There the Supreme Court held invalid as unreasonable and contrary to public policy a clause in a marine bill of lading reading as follows: "In the event of claims for loss, damage or short delivery, the same shall be adjusted on the basis of the invoice value *of the entire shipment* adding expenses necessarily incurred." (Italics supplied.) In the particular case, "the proof was that, owing to favorable market conditions existing at destination, the market value of all the merchandise which remained, sound as well as damaged, exceeded the values stated in the invoices, plus freight." Mr. Justice Roberts pointed out that "the measure of the shipper's recovery is normally the market value of the goods at destination, in like condition as they were when shipped, on the date when they should have arrived"; but that the particular clause plainly required "that if, after deduction of all loss and damage, the remaining cargo, in its then condition is worth more at destination than the whole cargo at place and time of shipment, the carrier shall be wholly exonerated." And,

"As pointed out by the court below if there were a short delivery of fifty cases out of a shipment of one hundred cases, but the market value of the goods delivered at the port of destination were equal to the invoice value of the hundred cases, plus freight, the carrier would pay nothing for negligent loss of half the shipment. Such an agreement is against public policy as its effect is to relieve the carrier from the consequences of its negligence."

The clause we are here dealing with does not appear to operate in that way. The omission here of the phrase "of the entire shipment," which was included in the Ansaldo Case, is significant; and the computation of the damages under the presently worded clause would seem to be quite different. There was no declared value, and the invoice value was based on the contract of purchase which stated the price as $32.50 per ton. In applying the present clause there is no necessity to first determine the invoice value of the "entire shipment". The clause is gratified by determining the amount of the whole tonnage damaged, and multiplying by the damage per ton, which in this case, on the basis of the contract price, was $7.50. See Western Transit Co. v. Leslie & Co. 242 U.S. 448, 454, 37 S.Ct. 133, 61 L.Ed. 423. In operation the clause only eliminates prospective profit, and limits the damage to the owner's actual loss in the transaction. It may even operate to his advantage if the market value at destination is less than the invoice value. In my opinion the clause is therefore different in its operation and effect from that condemned in the Ansaldo case.

In the Ansaldo Case two general types of valuation clauses were considered, one described as a "true limitation agreement" and the other as a "true valuation clause." The one involved in this case would seem to fall in the latter category. While its validity, especially in the absence of an opportunity to the shipper to pay a higher rate for a higher measure of damages, which is not here present, was not decided, I take the view after reading the cases specially cited in the opinion and other consideration of the subject, that the clause as here worded is not against public policy and should be given effect. [6] See particularly Gulf, etc., Ry. v. Texas Packing Co., 244 U.S. 31, 36, 37 S.Ct. 487, 61 L.Ed. 970; and the Ansaldo Case in the Circuit Court of Appeals, 2 Cir., 73 F. 2d 40, 42. The clause, as here worded, does not operate in favor of the carrier only, but will favor the shipper or consignee if the market value at destination is *less* than the invoice value, because the sound value of the goods is *measured* by the invoice value, and not merely *limited* thereby. The general rule of our law is freedom of contract, subject only to statute and considerations of the public interest. Where a contract stipulation is not clearly opposed to public policy it should be upheld, as it is the agreement of the parties. [7] The particular question

---

[6] The clause held invalid by Judge Coleman in Venezuelan Meat Export Co. v. United States, D. C., 12 F.Supp. 379, 388, was apparently a limitation clause and not a true valuation clause.

[7] Possibly some weight may also be given to the consideration that the bill of lading was issued in Japan and should not be assumed to be invalid in the absence of proof of the law of that country, and when not clearly against the public policy of this country. See E. Gerli & Co. v. Cunard S.S. Co., 2 Cir., 48 F.2d 115, 117.

is not likely to again arise as the subject is now regulated by the Carriage of Goods by Sea Act, § 4(5), 46 U.S.C.A. § 1304(5).

It results therefore that the proper computation of the damages to which the libellants are entitled is as follows:

| | |
|---|---:|
| 1630.95 tons of fish meal damaged to the extent of $7.50 per ton (that is, the invoice value of $32.50 per ton less the realized value of $25. per ton) | $12,232.12 |
| To which must be added expenses [8] the libellants incurred in handling the damaged materials amounting to | 2,114.63 |
| | $14,346.75 |
| Less the net amount received from insurance underwriters | 13,113.25 |
| | $ 1,233.50 |

The libellants are entitled to a decree for this principal amount with interest as adjusted at 6% from April 23, 1936, the date of denial of liability. Counsel may submit a decree in accordance herewith.

### Supplemental Opinion

The opinion in the above case was filed February 10, 1938. Thereafter counsel on both sides requested a re-hearing on certain points in the case which, probably due to the multiplicity of issues, had not been previously fully discussed; and on March 23rd, 1938, further argument was heard on the following points: (1) The computation of damages; (2) the sufficiency of the notice of claim with respect to the portion of the cargo discharged at Norfolk; (3) allowance of interest and costs. I will briefly state my conclusions with respect to these several matters.

1. *As to the computation of damages.* Assuming the validity of the bill of lading clause that claims against the carrier shall be adjusted and settled on the net invoice cost plus disbursements, counsel for the libellants contend that the method of calculation of damages set out in the opinion heretofore filed is incorrect. In lieu thereof it is now contended that the proper method of calculation is to first determine what was the percentage of damage or loss, and then

apply this percentage to the invoice value. On this basis taking the invoice value at $32.50 per ton, and the sound market value at $36.00 per ton, and the damaged value at $25.00 per ton, the percentage of loss is determined by the proportion of $11 to $36 per ton; that is, a percentage depreciation in value of 30.55%, which percentage when applied to the invoice value of $32.50 per ton is equal to $9.92875 per ton which, for 1630.95 tons, produces $16,193.29 as the monetary damage to the fish meal, to which add expenses of $2,114.63, making the total damage $18,307.92, from which should be deducted the net amount of proceeds of insurance of $13,113.25, making a recoverable damage of $5,194.67 instead of $1,233.50 as determined in the opinion.

Counsel for the libelants point out that this is the method of calculating the amount of loss under a *valued marine insurance policy on cargo* (See Richards on Insurance, 4th Ed., § 190, p. 291; 38 C.J., title Marine Insurance, p. 1129, § 382; Arnould on Marine Insurance, pp. 1314, 1319; Winter on Marine Insurance, pp. 341, 344; International Navigation Co. v. Atlantic Mutual Ins. Co., D.C., 100 F. 304; The British Marine Insurance Act of 1906, § 71(3); and it is said that the same method of calculation to determine the loss for damaged cargo on a general average adjustment is stated in Rule 16 of the York-Antwerp Rules of 1924. It is contended by counsel that this method of computation is required, at least by implication, by what was said in the case of The Ansaldo San Giorgio I v. Rheinstrom Bros. Co., 294 U.S. 494, 55 S.Ct. 483, 79 L. Ed. 1016. This view has previously been advanced by a commentator on the subject, 35 Columbia Law Review, page 502. But it is frankly admitted by counsel that this method of calculating damages has never heretofore been applied by any court in a case dealing with a clause submitting invoice value for market value. On the contrary it is my understanding that the calculation as made in the opinion, which was to deduct from the invoice value (which in this case included freight and other expenses) the damaged value has been uniformly applied. It was so applied in Gulf, Colorado & S. F. Ry. Co. v. Texas Packing Co., 244 U.S. 31, 36, 37 S.Ct. 487, 61 L.Ed. 970; in Pennsylvania R. R. Co. v. Olivit Bros., 243 U.S. 574, 576, 37 S.Ct. 468, 61 L.Ed.

---

[8] The libellants had no other disbursements because under the c.i.f. contract the freight and insurance premium were paid by Mitsubishi and included in its gross sale price of $32.50 per ton.

908; in The Oneida, 2 Cir., 128 F. 687, and in The Ansaldo Case, supra, in the District Court, 3 F.Supp. 579, 582. The method of computation now contended for was in the latter case definitely rejected, district judge Patterson saying:

"The construction of the clause is the next question. As an original matter, it might be urged that the libelant ought to recover the invoice value of the damaged goods; that, if 20 per cent. of the shipment were lost, the damages should be computed at 20 per cent. of the invoice value of the whole shipment, as under a valued policy of marine insurance. But the effect given to similar clauses in the past has been that the damages are the difference between the invoice value of the entire shipment and the market value at time and place of destination of the goods in their actual condition."

As previously noted, the case was reversed on appeal on the ground that the particular clause as there worded rendered it invalid.

Apart from the uniform authority to the contrary, it would seem at least doubtful whether the method now contended for is consistent with the wording of the clause in question which requires claim to be "adjusted and settled * * * on the net invoice cost plus disbursements." The ordinary calculation of damages due to a carrier's negligence is to deduct the damaged value from the sound value on arrival. The particular clause in consideration merely substitutes the invoice value for market value. If the method of calculating the damages now contended for is adopted, resort must be had to the extrinsic and variable factor of the market value which it was apparently the purpose of the clause to eliminate. The method of calculation used to determine loss or damage under a valued marine insurance policy on cargo (which differs from that on the ship's hull) proceeds on well established principles which do not seem to be here applicable. In view of the well established practice to the contrary, I do not feel warranted in adopting what would be a clear innovation in the method of calculating damages in this case even if it be assumed that the new method now proposed has the advantages claimed for it. I find nothing expressed in The Ansaldo Case which would seem to require a contrary conclusion.

2. *As to the sufficiency of notice of claim.* The bill of lading clause reads:

"22. The ship, and/or carrier, shall not be liable for any claim unless the *notice* thereof be given in *writing* to their agents at the place of delivery before *removal* of the goods from the *custody* of the ship or carrier." (Italics supplied.) Counsel for the respondent contends that written notice of claim was not given "before removal of the goods from the custody of the ship or carrier" at Norfolk. The voluminous testimony in the case has not been wholly transcribed, but as I recall the facts, stating them somewhat more fully than in the original opinion, the ship arrived at Norfolk on March 26, 1936, and sailed on March 27th, 20,000 bags of fish meal having been discharged from the ship onto the wharf. When Mr. Duggan (Baker's representative at Norfolk) discovered the probable damage to the fish meal while being discharged, he personally or by his agent, telephoned notice to the States Marine Corporation, the Norfolk agents of the ship, and their Mr. Hitch visited the dock and from time to time inspected the cargo while it was being discharged. After the cargo had all been discharged, Mr. Pratt, a representative of Baker, and representatives of the States Marine Corporation and surveyors, also made an inspection of the lots on the pier. On March 28, Duggan wrote to Baker in New York reporting the condition of the meal as discharged. In the meantime the ship had proceeded to Baltimore and discharged the remainder of the cargo. On March 30, Baker from New York wrote to the States Marine Corporation at Norfolk and also on the same day separately to Herd & Co., the Baltimore agents of the ship, definitely making claim for the damaged condition of the fish meal discharged at Norfolk and at Baltimore respectively. On April 23, 1936, the States Marine Corporation, the steamship agents, from their New York office, wrote to Baker at the latter's Baltimore office, denying liability and saying: "Surveys were made at both port of loading and discharge, cargo was loaded under the direct supervision of marine underwriter, dunnage, ventilating racks, special ventilators were all installed and Master's log shows constant ventilation enroute, and any damage that may have occurred can only be attributed to the inherent nature of the commodity. We would suggest you make claim against your cargo underwriters for any damage sustained." The latter letter refers specifically only to Baker's letter of March 30th to Herd regarding the cargo discharged at Baltimore, but taking

the correspondence as a whole in the light of the surrounding circumstances, Baker could very reasonably have considered the letter of April 23rd as denial of liability with respect to both the Norfolk and Baltimore cargoes.

It thus appears that (1) verbal notice of the damage was given while the cargo was being discharged; (2) was received and acted on by the ship's agent by inspection, before the cargo discharged at Norfolk was completely removed from the custody of the ship; and (3) formal written notice of the claim was given within three days thereafter, as soon as the facts were reported to Baker in New York by its Norfolk agent; and (4) the goods remained on the pier where they had been discharged for at least several days thereafter, available for and receiving further inspection by the ship's representatives. The only possible claim by the ship as to non-compliance with the clause is based on the contention that when the goods were unloaded on the pier from the ship they passed immediately out of the custody of the ship. Assuming this to be technically correct, I am nevertheless of the opinion that the libelants have affirmatively shown substantial compliance with the bill of lading clause as to notice of claim when reasonably applied, as it must be, with reference to the particular facts of the case. St. Louis, I. Mt. & So. Ry. Co. v. Starbird, 243 U.S. 592, 604, 37 S.Ct. 462, 61 L.Ed. 917; The Turret Crown, 4 Cir., 284 F. 439, 442; Southern Ry. Co. v. Mooresville Cotton Mills, 4 Cir., 187 F. 72; The West-Cawthon, 281 F. 894, D.C.Md. Here the only possible defect in literal compliance was as to the timeliness of the written notice. It was in fact given within three days after the discharge of the goods on the wharf and they remained there or in a nearby warehouse subject to inspection by the ship's agent for some time after the written notice had been given. The requirement that the notice be in writing is of importance to prevent disputes as to whether timely notice is in fact given. But here the fact is not disputed that notice, though oral, was in fact given to and acted on by inspection of the ship's agent timely. It is not doubted that these notice clauses in bills of lading are important and that cargo owners must prove substantial compliance with them, unless unreasonable in the circumstances. The J. L. Luckenbach, 2 Cir., 65 F.2d 570, 573. But to hold that the notice in this case under the particular circumstances was fatally defective

would be an unreasonable application of the clause. The ship owners obviously sustained no prejudice whatever by the possible defect in literal compliance and indeed they apparently thought so little of the point about notice that they did not set it up in their original answer to the libel. I therefore adhere to the view expressed in the original opinion that the libelants' claim for damage to the cargo discharged at Norfolk was not barred by insufficiency of notice of claim.

■ *3. As to interest and costs.* Counsel for the ship owners vigorously contend that viewing the case as a whole, no interest should be allowed on the libelants' claim for damages in the amount heretofore determined; and also that the whole costs of the case should be placed on the libelants. In support of this contention it is pointed out that the claim as originally made approximated $30,000 in amount and attention is called to the great disparity between the amount claimed and the amount recovered, to wit, $1,233.50, without interest. And it is argued that if the original claim had been limited to approximately the recovered amount the respondent would not have incurred the substantial expense occasioned in the defense of the much larger claim. It is also contended that the libelants should have voluntarily disclosed the amount of insurance realized by them during the progress of the case without putting the respondent to some expense in developing the facts by taking one or more depositions.

As to the allowance of interest, I see no just basis for withholding that in this case merely because the libelants' recovery is small. In fact, save for the fortunate circumstance of the insurance recovery in the net amount of over $13,000, the actual recoverable damages of the libelants would have been nearly $15,000. As previously indicated, interest is to be allowed on the libelants' claim only in the amount of their claim for the respective amounts thereof remaining unsatisfied from time to time after crediting the net proceeds of insurance when received.

■ The question of the allowance of costs is somewhat different. The libelants' taxable costs are somewhat less than $200; while those of the respondent are approximately $600, of which the largest item is $300 for premium on bond in the amount of $30,000 releasing the ship. As to the latter item, counsel for the respondent contend

that the bond required by counsel for the libelants was excessive in view of their recoverable damages. I have carefully examined the several items of costs as tentatively taxed by the clerk in the light of the respondent's contentions, but upon consideration I am unable to reach the conclusion that any part of the taxable court costs should be imposed upon the libelants. It is true that the case has finally resulted in a comparatively small damage decree but I cannot say that libelants' contentions for the much larger amount were not presented in entire good faith. The insurance collection which represented about half of their original claim was not made until long after the institution of the suit; and their contention that the computation of damages should be made on the basis of the market price of the cargo rather than on the invoice price presented, as heretofore indicated, a somewhat difficult question of law. The case is not one where the plaintiff consolidates several separate claims in one suit for an aggregate large amount with recovery on only one of the several distinct claims, and where the defendant successfully defeats most of the separate claims. In such a case there could well be an apportionment of the costs between the parties. But here the libelants' claim was based on one indivisible act of negligence on the part of the ship in the stowage of the fish meal, on which the libelants have prevailed. That the amount of their recovery is greatly less than the amount of their claim results from the fortunate circumstance of the collection of the insurance and the adverse view taken by the court on their contention as to the measure of damages. It is doubtless true that the respondent has incurred expenses in defence of the suit both in taxable and untaxable court costs proportioned to the size of the libelants' original claim; but this is not a circumstance which justifies me in apportioning the costs in the case. Indeed, if the insurance had not been collected by the libelants during the progress of the case, the point now made by respondent as to interest and costs would hardly have been arguable. The existence of the insurance claim was definitely known to the respondent from the beginning of the case; and it would seem that the respondent had equal opportunity with the libelants to appraise the legal point as to the proper measure of damage in the case.

I therefore adhere to the view that the libelants are entitled to interest on their recoverable damages adjusted as indicated and that taxable court costs in the case must be imposed on the respondent.